# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### October 19, 2010 Session

## STATE OF TENNESSEE v. DANNY RAY SMITH

**Appeal from the Criminal Court for Davidson County**
**No. 2005-C-2438     Steve R. Dozier, Judge**

---

**No. M2009-02275-CCA-R3-CD - Filed April 13, 2011**

---

The Defendant, Danny Ray Smith, was convicted of four counts of aggravated sexual battery, a Class B felony, and three counts of rape of a child, a Class A felony. See Tenn. Code Ann. §§ 39-13-504, 522. In this appeal as of right, the Defendant contends that (1) the trial court erred by allowing the victim to testify about instances of sexual contact between her and the Defendant other than those charged in the indictment; (2) the trial court erred by allowing a videotape of the victim's forensic interview to be played for the jury; (3) the trial court erred by allowing the State to cross-examine the Defendant about an expunged criminal conviction; (4) the evidence was insufficient to sustain the Defendant's conviction on count two of the indictment because the State's proof materially varied from the allegations in the indictment; (5) the trial court erred in denying the Defendant's motion for a judgment of acquittal on counts two, six, and seven; (6) the trial court erred by denying the Defendant's motion for a new trial which was based on newly discovered evidence; and (7) the trial court erred by imposing partial consecutive sentences. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Dawn Deaner, District Public Defender; Jeffrey A. DeVasher, Assistant Public Defender (on appeal); Jason Gichner, Assistant Public Defender (at trial); and Sharon Ruiz, Assistant Public Defender (at trial), for the appellant, Danny Ray Smith.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulaney Faughn, Assistant Attorney General; Victor S. Johnson, District Attorney General; Sharon Reddick, Assistant

District Attorney General; and Brian Keith Holmgren, Assistant Attorney General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

*I. Procedural History*

This case has a long and complex procedural history. The allegations leading up to the Defendant's trial were made in January 2005. However, the Defendant was not tried until four years later in January 2009. The indictment alleges that the Defendant committed one count of aggravated sexual battery and one count of rape of a child "on a day in December, 2004." The indictment also alleges that the Defendant committed two other counts of rape of a child and three other counts of aggravated sexual battery "on a date between January 1, 1999 and[] December 31, 2004." In January 2006, the State filed a bill of particulars alleging the following:

> **COUNT 1:** The nature of the alleged acts forming the basis for the count of Aggravated Sexual Battery. The count relates to an incident in which the Victim, [L.H.][1] (dob [sic] [19]92), was touched in a sexual manner by the defendant. The defendant placed his hand on the breast of the victim. This contact took place under the clothing and is believed to have occurred in December 2004. The defendant told her not to tell anyone or he would take her far away or that he would hurt her.
>
> The location of the alleged incident is believed to have occurred at a residence at . . . Netherlands Drive, Hermitage, TN.
>
> ....
>
> **COUNT 2:** The nature of the alleged acts forming the basis for the count of Rape of a Child. This count, as do all other counts, relate to the Victim [L.H.]. The defendant rubbed the Victim's vagina, both inside and out, with his penis. The acts that form this count occurred at the same place and time as those of Count 1.

_____
[1]This court refers to rape victims by their initials.

**COUNT 3:** The nature of the alleged acts forming the basis for the count of Rape of a Child. The alleged actions took place between 1 January 1999 and 1 December 2004. The Victim was eating cereal in the kitchen of her house. The defendant entered the room wearing a towel, pulled her head back, and placed his penis insider her mouth. He stopped when he heard the brother of the victim. This is believed to be the first time the defendant ever did anything of a sexual nature with the Victim.

It is believe the location of Count 3 occurred at . . . Belgium Court, Nashville, TN.

**COUNT 4:** The Nature of the alleged acts forming the basis of this count of Rape of a Child and Counts 5-7 all occurred at the same time. The mother of the Victim was out of town and her brothers were asleep. The Defendant took her to his room and placed his penis in her mouth.

It is unclear at this time the location of the incidents that form Counts 4-7.

**COUNTS 5-7:** The nature of the alleged acts forming the basis of the three counts of Aggravated Sexual Battery. The defendant rubbed the buttocks and breast of the Victim. He also placed his penis on the outside of the Victim's vagina, but is not believed to have penetrated her. The Defendant ejaculated on the floor on this occasion and subsequently wiped it up with a towel.

Shortly after the bill of particulars was filed, the State also provided notice that it was seeking to use the Defendant's prior conviction for attempted bribery of a public servant as impeachment evidence pursuant to Tennessee Rule of Evidence 609.

Between the time of these initial filings and the trial date, both the original prosecutor and defense counsel had left the case. Shortly before trial, the State filed an amended bill of particulars alleging the following:

COUNT 1: The nature of the alleged acts forming [] the count of Aggravated Sexual Battery. The count relates to an incident in which the victim, [L.H.] (dob [sic] [19]92), was touched in a sexual manner (i.e. breasts, outside her genitals, with his penis, and with his hand) by the defendant. The contact occurred on a date around Christmas of 2004 after the victim had returned from a trip to Walmart [sic] with her mother and her mother had left again leaving the victim in the home with the defendant . . . .

It is believe[d] the location of the incident was the family's home on Netherlands Drive in Davidson County.

COUNT 2: The nature of the alleged acts forming the basis for the count of Rape of a Child. Refers to the same incident as that of count 1 and relates to the defendant touching the victim on the inside of her genitals with his penis.

COUNT 3: The nature of the alleged acts forming the basis for the count of Rape of a Child. The alleged act [took] place between January 1, 1999 and December 1, 2004. The victim was eating cereal in the kitchen of her house. The defendant entered the room, pulled her head back, and place[d] his penis in her mouth. This is believed to be the first time the defendant ever did anything of a sexual nature with the victim.

It is believed the location of the incident was the family's home on Belgium Court in Davidson County.

COUNT 4: The nature of the alleged acts forming the basis of the count of Rape of a Child. Refers to an incident that occurred [when] the mother of the victim was out of town, most likely in July of 2004. The defendant took the victim into his room and place[d] his penis in her mouth.

It is believe[d] the location of this incident was the family's home on Netherlands Drive in Davidson County.

COUNT 5: The nature of the alleged act forming the basis of the count of aggravated sexual battery. Refers to an incident wherein the defendant required the victim to look at a pornographic magazine and then required her to masturbate his penis.

It is believe[d] the location of the incident was the family's home on Baton Rouge in Davidson County.

COUNTS 6-7: The nature of the alleged acts forming the [basis] of these counts of Aggravated Sexual Battery. Refers to [two] separate acts of multiple incidences of sexual contact between the defendant and the victim over the time frame of January 1999 and 2004. These counts refer to the defendant touching the victim's breasts, buttocks, and genitals with his hand, touching her genitals on the outside with his penis, and having her touch his penis with her hand.

-4-

The location of the incidents would have been the family's home on Baton Rouge, Andrew Jackson, or Netherlands in Davidson County.

Additionally, the Defendant filed a proposed order of expungement for his conviction of attempted bribery of a public official prior to trial, while the State's Rule 609 notice was pending. Without knowing about the Defendant's pending charges in the present matter, an Assistant District Attorney and the judge in the attempted bribery case signed the order. Accordingly, the State filed a notice to use the expunged conviction as a prior bad act for impeachment purposes pursuant to Tennessee Rule of Evidence 608.

*II. State's Evidence at Trial*

At trial, the victim, L.H., testified that she was born in 1992, and that she was less than 13 years old when the Defendant had sexual contact with her. During the time period listed in the indictment, L.H. lived with her mother, her two brothers, and the Defendant. The Defendant began living with L.H. and her family in 1997, and in 2001, the Defendant married L.H.'s mother. L.H.'s mother testified that she first met the Defendant while he was coaching her son's football team. L.H.'s mother testified that all of her children loved the Defendant like a father and that there were no conflicts between the Defendant and L.H. L.H. testified that during the time period listed in the indictment, her family lived in four different residences: a duplex located on Belgium Court, a residence located on Baton Rouge,[2] another residence located on Andrew Jackson, and a home on Netherlands Drive.[3]

L.H. testified that the first sexual encounter with the Defendant she could remember occurred at the Belgium Court duplex when she was six or seven years old. L.H. testified that the Defendant came into the room and "put his hand down [her] pants and rubbed on [her] vagina" until she woke up. L.H. and her mother testified that L.H. shared a bedroom with her brothers at that duplex and that L.H. slept on the top bunk, while her brothers slept on the bottom bunk. L.H. testified that she could remember two or three other instances where the Defendant engaged in sexual contact with her at that duplex. L.H. told the jury that one morning she was eating cereal when the Defendant came into the kitchen wearing only a towel. L.H.'s brothers were upstairs getting ready for school, and L.H.'s mother had already left for work. The Defendant grabbed L.H.'s hair, pulled her hair back, and then "stuck his penis in [her] mouth." The Defendant quickly removed his penis "put his towel

---

[2]L.H.'s uncle lived with the family at the Baton Rouge residence in a downstairs "den."

[3]L.H.'s mother provided corresponding dates for when the family lived in each residence: Belgium Court from May 1998 to May 1999, Baton Rouge from May 1999 to May 2000, Andrew Jackson from May 2000 to February 2002, and Netherlands Drive from February 2002 to the time of trial.

back on and went upstairs like nothing ever happened."  Similarly, L.H.'s mother testified that the Defendant would often pull her hair during sex.

L.H. testified that while her family was moving to the residence at Baton Rouge, the Defendant went back to the duplex "to get more stuff" and insisted that she go with him. Once at the duplex, the Defendant forced L.H. to perform fellatio on him.  When she finished, he picked a "sucker" up from the floor and "tried to give" it to her "as an award." L.H. also testified that while living at the Baton Rouge residence, the Defendant took her downstairs to her uncle's room, showed her a pornographic magazine, and forced her to masturbate him while they looked at the magazine.  L.H.'s mother testified that her brother kept a basket full of pornographic magazines when he lived with them at the Baton Rouge residence and that the children were not allowed in his room.  On another occasion, at the Baton Rouge home, L.H. was home sick from school when the Defendant forced her to perform fellatio on him.

L.H. testified that after the family moved to the Andrew Jackson home, the Defendant began to show her pornographic videos.  On one occasion, the Defendant sat in a pink chair in L.H.'s room and forced her to sit in his lap and masturbate him while they watched a pornographic video.  L.H.'s mother testified that at the Andrew Jackson residence, L.H. had a table with two pink chairs and a combination television and VCR.  L.H.'s mother also testified that she knew the Defendant kept pornographic videotapes with the family's home movies.  On another occasion at the Andrew Jackson home, L.H. was asleep in her room with her little brother sleeping on a trundle bed next to her.  The Defendant entered the room and removed L.H.'s clothes.  The Defendant then rubbed his penis on the outside of L.H.'s vagina until he ejaculated on her bed and left the room.  L.H. also testified that one day at the Andrew Jackson house, her brothers had a friend over when the Defendant made them lunch. After making lunch, the Defendant took her into a bathroom, where he made her masturbate him until he ejaculated.  The Defendant then sent L.H. to the kitchen to have lunch with the other children.

L.H. testified that once the family moved to the Netherlands Drive house, the Defendant began to show her pornography on the computer.  L.H.'s mother testified that she knew the Defendant kept pornography on the computer.  L.H. told the jury that she "usually" had to masturbate the Defendant until he ejaculated when they viewed pornography on the computer.  L.H. testified that this happened "a lot" and that sometimes the Defendant would rub the outside of her vagina with his hand while they viewed the pornography.  L.H. testified about several other incidents that occurred while her family was living at the Netherlands Drive house. L.H. testified that on one occasion, the Defendant rubbed his penis on the outside of her vagina and sniffed a substance in a bottle labeled "Rush."  L.H. also testified that the Defendant had a secret compartment in his dresser where he kept a pair of

handcuffs and that on one occasion, he handcuffed her to her bed and rubbed his penis on the outside of her vagina until he ejaculated. L.H.'s mother testified that there was a hidden compartment in the dresser and that she found a yellow sock among the Defendant's clothing. L.H. also recalled that on one occasion the Defendant asked her, "Who's your daddy" while he rubbed his penis on her. L.H.'s mother testified that the Defendant would ask her "Who's your daddy" while they had sex and that there was no reason for L.H. to have known that phrase.

L.H. told the jury that while she was living at Netherlands Drive her mother went on an overnight business trip. The Defendant took L.H. into her mother's bedroom where he forced her to perform fellatio on him and then he rubbed his penis on the outside of her vagina until he ejaculated. L.H. testified that this incident "took a lot longer than most of the times." On another occasion, when L.H. was home after school, the Defendant performed cunnilingus on her. L.H. testified that while the Defendant performed cunnilingus on her, her mother called the Defendant on his cell phone. The Defendant answered the phone and was out of breath. The Defendant told her mother that he was "not trying to get off of the phone." L.H.'s mother testified that during her relationship with the Defendant, she only went on one out of town business trip. L.H.'s mother recalled that while she was on that trip, she called the Defendant, the Defendant answered the phone and seemed like he was out of breath. The Defendant tried to hurry her off the phone. L.H.'s mother testified that this occurred in July 2004.

L.H. testified that the last incident occurred around Christmas 2004. L.H., her mother, and her step-sister had gone to Wal-Mart when L.H. began to feel ill. Her mother brought her back home, where she was left alone with the Defendant. L.H. testified that the Defendant entered her room, took her clothes off, and rubbed his penis on the outside of her vagina. L.H. screamed for help, and the Defendant said, "Nobody is going to help you . . . [n]obody can hear you[,] [j]ust shut up." L.H. cried while the Defendant continued to rub his penis on her. L.H.'s mother testified that when she returned home from Wal-Mart, L.H. had been crying and that when she asked L.H. what was wrong, L.H. became so upset she began throwing up.

In January 2005, L.H. was playing on a trampoline in her front yard with two friends. Her friends were complaining "about how their [lives] [were] terrible" when L.H. became upset and started crying. L.H. then told them about what the Defendant had done to her over the past several years. L.H. made her friends promise not to tell anyone about the Defendant's sexual abuse. L.H.'s friend and neighbor, N.W.,[4] returned to her home and told

---

[4]All minors involved in this case will be referred to by their initials in order to protect their privacy.

her mother. N.W.'s mother then called the police. L.H. testified that she never wanted to call the police or tell her mother because she was scared of the Defendant.

One of the first police officers to speak with L.H. was Officer Craig Christie of the Metropolitan Police Department (MPD). L.H. at first denied that the Defendant had done anything to her because she was scared, but she eventually admitted to Officer Christie that the Defendant had sexually abused her. Officer Christie testified that he was not trained to interview the victim; therefore, he only asked general questions to determine if a detective should be called. L.H.'s mother was not at the home when the police first arrived. After she arrived and was told why the police were there, L.H.'s mother began to cry and "got really mad, very angry." L.H. tried "to calm her mother down," telling her that it was okay and that everything would be fine. Officer Christie recalled that they were not at the house long before L.H., her mother, and her brothers were taken to the police station.

Detective Ken Potter of the MPD testified that he interviewed L.H. and her mother at the police station. Detective Potter spoke with L.H.'s mother alone and testified that she was "appropriately upset" and told him that she believed L.H. because she "had an attitude but she was honest." Detective Potter asked L.H.'s mother if the Defendant did or said anything unusual when they had sexual intercourse. L.H.'s mother told Detective Potter that the Defendant would rub his penis on her genitals and say, "Who's your daddy." Detective Potter then interviewed L.H. and asked her what the Defendant would say to her during sexual encounters. L.H. told Detective Potter that the Defendant would say, "Who's your daddy" and threaten to hurt her or take her away if she ever told anyone about what he had done.

Detective Potter testified that the purpose of his interview with the victim was to confirm the allegations and determine whether a forensic interview conducted by an expert in child sexual abuse was needed. Detective Potter told the jury that his interview with the victim was not intended to be thorough and that it was common for more details to come out in the forensic interview or at trial. During the interview, L.H. told Detective Potter that the Defendant had licked and felt her breasts and vagina and that he had felt her buttock. L.H. also told Detective Potter that the Defendant made her masturbate his penis, perform fellatio on him, and the Defendant would rub his penis on her vagina. When asked by Detective Potter how many times this had happened to her, L.H. responded that it had happened "5,000 times or more." L.H. testified that she meant it had happened so many times she could not remember an exact number, and Detective Potter testified that is what he understood her to mean. L.H. also told Detective Potter that she did not know how to describe the Defendant's penis but that the Defendant did ejaculate.

After his interview with L.H., Detective Potter spoke with L.H.'s mother and she agreed to conduct a "controlled phone call or a pretext phone call" with the Defendant. L.H.'s mother called the Defendant, while Detective Potter recorded the conversation. During the controlled call, L.H.'s mother confronted the Defendant with L.H.'s allegation. The Defendant "adamantly denied that the allegations were true." The Defendant stated that he was only alone with L.H. a few times and that he never had the opportunity to commit the alleged acts. However, L.H.'s mother testified that she worked full-time but that the Defendant did not always work and had opportunities to be alone with L.H. During the controlled call, L.H.'s mother also confronted the Defendant about showing pornography to L.H. The Defendant suggested that L.H. may have walked in while he was viewing pornography but that he did not show it to her. Toward the end of the conversation, the Defendant asked L.H.'s mother if he could go home or if he would be arrested when he got there.

Detective Potter admitted that no physical evidence was ever collected in this case. Detective Potter also admitted that no witness involved in the case had ever suspected the Defendant of raping L.H. prior to her allegations. On cross-examination, Detective Potter also acknowledged that during his interview with L.H., she did not tell him about several of the specific instances she testified about at trial. However, Detective Potter reiterated that the purpose of his interview was to simply verify the allegations, not to get specific details of each offense. Detective Potter also testified that since 2005 no one had ever came forward alleging that L.H. had lied about the allegations.

Frankie Cowan testified that she was the former clinical direct of the Nashville Child Advocacy Center, where she served as a child therapist and supervised other therapists and forensic interviewers. In January 2005, a forensic interview of L.H. was conducted by Jennifer Hastings. Ms. Cowan supervised the interview. Ms. Cowan testified that a forensic interviewer is not trained to obtain every detail of the abuse but that they only determine if harm was done to the child. During the interview, the forensic interviewer asks broad questions followed by more detailed questions. The forensic interviewer does not ask the victim "to tell me everything that has ever happened to you of a sexual nature," nor does the interviewer tell the child that it is important to tell everything that happened. Ms. Cowan testified that it is not unusual for a child to give more information or detail after the forensic interview.

During Ms. Cowan's testimony, the jury was shown a videotape of L.H.'s forensic interview. The interviewer asked L.H. what the Defendant did, and after a long pause, L.H. said that the Defendant would rub her vagina, buttock, and breasts and that the Defendant would lick her vagina. The interviewer then asked L.H. to tell her about the last time it happened. L.H. told the interviewer about the incident after her trip to Wal-Mart and said

that the Defendant "whooped" her when she started screaming and then rubbed her vagina with his penis. The interviewer asked L.H. to tell her about the first time and L.H. described the incident when she was eating breakfast and the Defendant stuck his penis in her mouth. L.H. then told the interviewer that when she lived "in the white house," the Defendant made her watch a pornographic movie while her brother played a video game in the other room. L.H. told the interviewer that the Defendant showed her the movie in her room, on her television, while they sat in a pink chair and he touched her vagina under her clothes.

The interviewer asked L.H. if the Defendant ever made her touch any part of his body. L.H. responded that "sometimes" the Defendant told her to touch his penis and "sometimes" he told her to put his penis in her mouth. L.H. also told the interviewer that the Defendant showed her another pornographic film while they lived "at the white house" but that she could not remember if he touched her. The interviewer asked L.H. if she could remember any other times the Defendant touched her. L.H. told her that her mother had been out of town for a work trip and that while they were in his bedroom, the Defendant put his penis in her mouth, rubbed her breast and buttock with his hands, and rubbed his penis on her vagina until "white stuff came out." L.H. also said that sometimes the Defendant would say, "Who's your daddy" but that the Defendant never put his penis insider her vagina.

L.H. admitted during her testimony that she did not tell Officer Christie, Detective Potter, or the forensic interviewer about several of the incidents she had testified about at trial. These incidents included, the first incident she remembered, the incident that occurred during the move from the duplex to Baton Rouge, that the Defendant had shown her pornographic magazines, that the Defendant had shown her pornography on the computer, the incident that occurred with her little brother in the room, and the incident with the handcuffs. L.H. also admitted that she had told the forensic interviewer that the breakfast incident was her first sexual contact with the Defendant. However, L.H. testified that even though she did not tell the police or the forensic interviewer everything, she had told them everything she could think of. L.H. also testified that she did not offer information if she was not specifically asked about it.

On cross-examination, L.H. admitted that a few weeks before she told her friends about the Defendant's actions, she told her mother she wanted to live with her biological father and argued with her mother about it. L.H. testified on redirect-examination that she wanted to live with her father to get away from the Defendant. L.H.'s mother testified that L.H. asked to live with her biological father and said that she wanted her biological father and mother to get back together. Defense counsel questioned L.H. about how the Defendant would discipline her. L.H. responded by saying that the only discipline the Defendant would inflict on her was "sexual abuse." Despite defense counsel's questioning, L.H. denied that she had misbehaved at the Wal-Mart and that her mother had taken her back home for the

Defendant to discipline her. L.H.'s mother also testified that L.H. had not been "acting up" at the Wal-mart and that she took her home because L.H. felt ill. L.H. admitted on cross-examination that she had sent the Defendant a Valentine's Day card after she had accused him of sexual abuse. L.H. also admitted that after the allegations were made, she hugged the Defendant and gave him a father's day gift. L.H. testified that even after all the Defendant had done to her, she still loved him like a father.

L.H.'s mother testified that L.H. continued to suffer after making these allegations against the Defendant. Specifically, L.H. was unable to see her step-brothers and this "devastated" her. Additionally, without the Defendant's financial support, L.H.'s mother had to take a second job and was at home less. L.H. was in counseling, including counseling with Ms. Cowan, and had failed a grade in school. L.H.'s mother also testified that L.H. never recanted her story. However, L.H.'s mother admitted on cross-examination that neither she nor her other children ever saw the Defendant act inappropriately around L.H. L.H.'s mother testified that while the Defendant was in prison, she received a letter from him in which he told her that things could go back to normal if she and L.H. did not testify. The Defendant offered to help L.H.'s mother in custody proceedings with L.H.'s biological father if she helped him in his criminal case.

L.H.'s mother admitted on cross-examination that after L.H. made the allegations against the Defendant, she remained married to the Defendant for over a year and a half. Additionally, the Defendant financially supported the family for over two years after the allegations were made. L.H. and her family continued to have contact with the Defendant and traveled with him to weekend basketball tournaments and on family vacations. L.H.'s mother admitted that she only divorced the Defendant after the Department of Children's Services (DCS) took her children away for continuing to have contact with the Defendant. L.H.'s mother also admitted that a week after the allegations were made, she and the Defendant took a vacation together, but she testified she did it "to get [the Defendant] to admit to [her] what he had done." L.H.'s mother testified that she did not continue to see the Defendant because she did not believe her daughter but that she continued to contact him because she loved the Defendant. She said that she regrets her actions.

*III. State's Election*

At the close of the State's proof, it made the following elections:

Count One of the Indictment alleges an act of aggravated sexual battery . . . and refers to the following conduct: the defendant rubbed his penis on [L.H.'s] vagina in a bedroom of the residence at Netherlands Drive. This happened

after [L.H.] came home from a trip to Walmart [sic] with her mother. [L.H.] was crying and screaming and telling the defendant to stop.

Count Two of the Indictment alleges an act of rape of a child . . . and refers to the following conduct: the defendant committed an act of sexual penetration against [L.H.], in that he licked her vagina with his tongue in a bedroom of the residence at Netherlands Drive.

Count Three of the Indictment alleges an act of rape of a child . . . and refers to the following conduct: the defendant committed an act of sexual penetration against [L.H.] in that the defendant pulled [L.H.'s] head back by the hair and placed his penis in the mouth of [L.H.] in the kitchen of the duplex residence on Belgium Court. [L.H.] indicated [that] this was one of the first incidents of sexual conduct that she can remember. She described the defendant as wearing a towel after he had gotten out of the shower.

Count Four of the Indictment alleges an act of rape of a child . . . and refers to the following conduct: the defendant committed an act of sexual penetration against [L.H.] in that [he] placed his penis in her mouth in a bedroom of the residence at Netherlands Drive. [L.H.] indicated that her mother was out of town and indicated that the defendant also grinded his penis on her vagina after he had put his penis in her mouth. [L.H.] described that this was one of the longest incidents of sexual abuse that took place.

Count Five of the Indictment alleges an act of aggravated sexual battery . . . and refers to the following conduct: the defendant had [L.H.] masturbate his penis after he showed her pornographic magazines in her uncle's room in the residence on Baton Rouge.

Count Six of the Indictment alleges an act of aggravated sexual battery . . . and refers to the following conduct: the defendant had [L.H.] masturbate his penis after he showed her a pornographic movie on the VCR in her bedroom in the residence on Andrew Jackson. [L.H.] described that she was sitting on pink chairs in her bedroom when this occurred.

Count Seven of the Indictment alleges an act of aggravated sexual battery . . . and refers to the following conduct: the defendant had [L.H.] masturbate his penis after he showed her pornographic material on the computer in the living room of the residence on Netherlands Drive.

-12-

*IV. Defendant's Evidence at Trial*

Kenneth Koontz testified that his step-daughter was friends with L.H. in 2005. Mr. Koontz told the jury that a week or two after L.H. had been interviewed by the police, he picked L.H. up from the Netherlands Drive residence so she could spend the night with his step-daughter. On the drive back to his house, Mr. Koontz asked L.H. what she wanted to do when she grew up. Mr. Koontz testified that L.H. answered that she wanted to be a writer because she had "the ability to make things up and get people in trouble." L.H., during her testimony, denied ever saying this to Mr. Koontz. On cross-examination, Mr. Koontz admitted that he never contacted the police about L.H.'s alleged statement. Mr. Koontz admitted that he was a former police officer and understood the exculpatory nature of L.H.'s alleged statement. Mr. Koontz testified that he did not come forward until he was contacted by an attorney involved in the case but that he could not remember if the attorney was a member of the prosecution or the defense team. On cross-examination, Mr. Koontz also testified that he could not recall telling his ex-wife that the Defendant told him "the worst [the Defendant] ever did was show [L.H.] pornography."

The Defendant denied that he ever had any type of "inappropriate relationship" with L.H. and that he ever had any sexual contact with L.H. The Defendant specifically denied all of L.H.'s allegations. The Defendant testified that he had "a really good relationship" with L.H. and her brothers, that he loved them, and that he was fully involved in their lives. However, the Defendant testified that when he first moved in with L.H.'s mother, there were "discipline problems" with the children "not minding [their mother]." According to the Defendant, L.H. "had a little bit of a problem with backtalking" and "didn't receive [discipline] very well." The Defendant testified that L.H. would tell him "that [he] wasn't her father and that [he] couldn't tell her what to do."

The Defendant testified that everyone in the house slept with their door open and that he would not wear only a towel around the house. The Defendant also testified that he may have asked L.H.'s mother "Who's your daddy" while they were having sex but that "[i]t was kind of a joke thing." The Defendant also claimed that it "was a common phrase that everybody said" and that "[w]e all said it around the house as a joke all of the time." The Defendant denied ever showing L.H. pornographic material as well as telling Mr. Koontz that he had shown L.H. pornographic material. The Defendant claimed that L.H. and her brothers found the pornographic magazines in their uncle's bedroom. The Defendant admitted to viewing pornography on his computer but claimed that it was only after he moved out of the Netherlands Drive house. The Defendant also claimed that L.H.'s mother only confronted him about pornographic movies that had been rented from the cable company and, according to the Defendant, it had been L.H.'s older brother who was renting those movies. The Defendant denied ever hiding a substance called "Rush" or "Haze" in a

yellow sock in his bedroom. The Defendant also denied that he laughed during the controlled phone call with L.H.'s mother. Instead, the Defendant insisted that he was crying and it only sounded like he was laughing.

The Defendant admitted on direct examination that he had been employed as a parole officer and that he lost his job after taking "a check from a family inappropriately" and cashing the check. The Defendant also admitted on direct examination that when he was initially asked about the check he denied that he had taken the check. On cross-examination, the Defendant again admitted that he was fired from his job as a parole officer for taking a check from the family of a parolee. The Defendant also admitted that when he was shown the check with his endorsement that he denied taking and signing the check.

The Defendant testified that after L.H. made the allegations against him, he moved out of the house at Netherlands Drive. However, the Defendant testified that L.H.'s mother wanted to see him and talk to him. The Defendant and L.H.'s mother went on a vacation together a few weeks after L.H. had spoken to the police. The Defendant continued to coach L.H.'s brothers in basketball and continued to referee youth sporting events. The Defendant testified that after L.H. had gone to the police, he felt guarded around L.H. and no longer felt comfortable around L.H. The Defendant testified that he and L.H.'s mother spoke to each other every day for over a year after the allegations were made. The Defendant also continued to support L.H.'s family financially and had a joint bank account with L.H.'s mother. The Defendant testified that he helped L.H.'s mother retain an attorney for her children's custody proceedings. According to the Defendant, it was only after DCS took L.H. and her brothers away from their mother that she cut off contact with him.

On cross-examination, the Defendant admitted that he wrote L.H.'s mother a letter while he was in prison. The Defendant denied that he intended to get L.H. and her mother not to testify or to lie about what happened. However, the letter proposed that the Defendant would testify on behalf of L.H.'s mother if she would help him at his criminal trial. The letter also requested L.H.'s mother to tell the police that she was mistaken about the information she had provided and that the whole situation was a mistake. In the letter, the Defendant begged L.H.'s mother "not to let them put [him] in prison for the rest of [his] life." The Defendant, in the letter, also denied ever asking L.H.'s mother "Who's your daddy."

The Defendant testified that L.H. never saw him and her mother engaged in sexual activity. The Defendant told the jury he did not know where L.H. had learned "all of that specific sexual knowledge." Instead, the Defendant testified that it was just a coincidence L.H. knew about hair pulling and his habit of saying, "Who's your daddy" during sexual intercourse. The Defendant also claimed that L.H. was motivated to lie about him because

-14-

she wanted "to be with her father and to live with her father which she told her mother that all of the time."

Jacob Smith, the Defendant's son, testified that he lived with the Defendant and L.H.'s family for half of a school year and that he visited every other weekend. Mr. Smith testified that he never saw anything inappropriate between the Defendant and L.H. According to Mr. Smith, the Defendant would discipline L.H., who did not like the Defendant because of his discipline. Mr. Smith testified that L.H. wanted to live with her biological father and that she "did not like [the Defendant] at all."

*V. Verdict and Sentencing*

Based on the foregoing evidence, the Defendant was convicted of four counts of aggravated sexual battery, a Class B felony, and three counts of rape of a child, a Class A felony. A sentencing hearing was held on February 20, 2009, during which L.H.'s mother testified about the effect the Defendant's crimes have had on L.H. L.H. failed a grade in school and does not like to be alone because "it gives her time to think about what had happened to her." L.H.'s mother testified that L.H. was afraid that the Defendant would come and kill her and that L.H. slept with a knife under her bed. L.H. also missed her step-brothers and had been in counseling. Ms. Cowan testified that she had counseled L.H. for a period of time and that L.H. had trouble in school, suffered from depression, had disturbing nightmares, and suffered from "an overall general feeling of fearfulness." Ms. Cowan also testified that L.H. suffered from an "overwhelming responsibility and guilt for having been involved in sexual activity with" the Defendant and the subsequent break-up of their family.

Several members of the Defendant's family testified at the sentencing hearing. They all expressed their belief that the Defendant did not commit the crimes. They all also testified that the Defendant was a good man, that he was a man of good moral character, and that he had given back to his community by working with children for a long time. The Defendant's stepmother testified that the Defendant had served in the military for several years and was honorably discharged after he injured himself "jumping out of planes." The Defendant's current wife testified that she loved the Defendant and trusted him completely to live with her 14 year-old daughter.

The trial court issued its sentencing order on March 26, 2009. The Defendant was classified as a Range I offender. While the State presented several enhancement factors at the sentencing hearing, the Defendant's crimes were committed before the 2005 amendments to the sentencing statute. The Defendant did not file a waiver to be sentenced under the amended statute, therefore, the Defendant was sentenced under the pre-2005 statute. The trial court ruled that because the State's proposed enhancing factors had not been found by

a jury, it could not consider them. Accordingly, the trial court sentenced the Defendant to the minimum sentence on each count: eight years for each count of aggravated sexual battery and fifteen years for each count of rape of a child. The trial court ordered count one and count four to be served consecutively. The trial court ordered that the remaining charges be served concurrently, for an effective 23-year sentence to be served at 100 percent. See Tenn. Code Ann. § 40-35-115(b)(5).

## ANALYSIS

*I. Evidence of Uncharged Sexual Contact Between the Defendant and L.H.*

The Defendant contends that the trial court erred by allowing L.H. to testify about instances of sexual contact between herself and the Defendant that were not charged in the indictment or listed in the bill of particulars. The Defendant further contends that most of L.H.'s testimony was about uncharged offenses and that the jury "heard more testimony about uncharged acts than it heard about the charges for which the [D]efendant was actually on trial." The Defendant argues that the evidence was inadmissible under Tennessee Rule of Evidence 404(b) and that it did not fall under the narrow exception to Rule 404(b) enunciated by the Tennessee Supreme Court in State v. Rickman, 876 S.W.2d 824 (Tenn. 1994). The State responds that the trial court properly admitted the evidence under Rickman's narrow exception to Rule 404(b). The State argues that the indictment in this case was not time specific, that the evidence related to sex crimes that occurred during the time as charged in the indictment, and that it made a proper election at the close of its case-in-chief.

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that person's actions were in conformity with the character trait. Tenn. R. Evid. 404(b). This rule "is based on the recognition that such evidence easily results in a jury improperly convicting a defendant for his or her bad character or apparent propensity or disposition to commit a crime regardless of the strength of the evidence concerning the offense on trial." Rickman, 876 S.W.2d at 828 (citing Anderson v. State, 56 S.W.2d 731 (Tenn. 1933)). The danger of a jury improperly convicting a defendant based on their character rather than the evidence presented at trial "particularly exists when the conduct or acts are similar to the crimes on trial." Id. (citing State v. Parton, 694 S.W.2d 299, 303 (Tenn. 1985)). Accordingly, Rule 404(b) is generally one of exclusion, but exceptions to the rule may occur when the evidence of the otherwise inadmissible conduct is offered to prove the motive of the defendant, identity, intent, the absence of mistake or accident, opportunity, or a common scheme or plan. State v. Tolliver, 117 S.W.3d 216, 230 (Tenn. 2003); State v. McCary, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003).

The issue of whether to admit evidence of other sexual offenses committed by a defendant presents unique difficulties under the Rule 404(b) analysis. The Tennessee Supreme Court explicitly declined to recognize a general "sex crimes" exception to Rule 404(b) that would have allowed evidence of other sexual offenses to be admitted at trial. Rickman, 876 S.W.2d at 828-29. In declining to adopt this exception, our supreme court noted that "evidence admitted under a general sex crimes exception is said to be for purposes of corroboration, or to show the intimate relations between the parties, or to show that the defendant had a lustful disposition." Id. at 828. The supreme court held that these exceptions were not embodied in Rule 404(b) and rejected them in its Rickman opinion. Id. at 829-30. Instead, "evidence of prior sexual misconduct is governed by the same evidentiary rules as evidence of other non-sexual misconduct." Id. at 829.

The supreme court created a narrow "special rule admitting evidence of other sexual crimes when an indictment charges a number of sexual offenses, but alleges no specific date upon which they occurred." Rickman, 876 S.W.2d at 828. This narrow exception applies "in the prosecution of criminal acts committed against young children who are frequently unable to identify a specific date on which a particular offense was committed." Id. Therefore, "where the indictment charges that sex crimes occurred over a span of time, evidence of unlawful sexual contact between the defendant and the victim allegedly occurring during the time charged in the indictment is admissible." Id. Additionally, "the State must elect at the close of its proof-in-chief as to the particular incident for which a conviction is being sought." Id. at 829. However, when the indictment is date specific, "the prejudice resulting from such [evidence] outweighs its probative value." Id. at 830 (citing State v. Burchfield, 664 S.W.2d 284, 287 (Tenn. 1984)).

The evidence at issue falls within the Rickman exception to Rule 404(b). The indictment was not time specific and alleged that the charged offenses occurred between January 1, 1999 and December 31, 2004. The uncharged incidents of sexual abuse that the victim testified about occurred during that time period. The victim testified that she had trouble remembering the details and when the individual instances of sexual contact occurred. The victim also told the police and the forensic interviewer that she could not remember everything. While the bill of particulars was able to "outline a few details" about the charged instances of sexual contact, it was also not time specific. See State v. Scott W. Grammer, No. E2005-02604-CCA-R3-CD, 2007 WL 595908, at *6 (Tenn. Crim. App. Feb. 26, 2007), perm. app. denied (Tenn. June 18, 2007). Furthermore, when determining whether evidence is admissible under the Rickman exception, "the relevant inquiry is not the information in the bill of particulars but the information set forth in the indictment." Id. (citing Rickman, 876 S.W.2d at 829). The differences between the bill of particulars and the State's election of offenses "illustrate[d] the uncertainty on the part of the prosecution and demonstrate[d] that the State needed the 'latitude in the prosecution of criminal acts

-17-

committed against young children' discussed in Rickman." Id. at *7 (quoting Rickman, 876 S.W.2d at 829). Accordingly, we conclude that the trial court did not err in ruling that the Rickman exception applied in this case and in admitting L.H.'s testimony regarding other instances of sexual contact with the Defendant.

## II. Use of L.H.'s Forensic Interview as a Prior Consistent Statement

The Defendant contends that the trial court erred by allowing a videotape of L.H.'s forensic interview to be played for the jury as a prior consistent statement. The Defendant argues that only a small portion of the videotaped interview was actually consistent with L.H.'s trial testimony. Therefore, the Defendant contends, the videotape could not be played as a prior consistent statement and that the videotape improperly bolstered L.H.'s credibility. The State responds that defense counsel's cross-examination of L.H. brought her credibility into question and insinuated that her trial testimony was fabricated. Accordingly, the State argues, the videotaped interview was a proper prior consistent statement. The State also responds that any inconsistencies in the interview were used by the Defendant to his advantaged at trial and that the Defendant cannot show he was prejudiced by the use of the videotape.

This court has held that "[o]rdinarily, it is impermissible to corroborate a witness' testimony by evidence of the witness making prior consistent statements, absent an impeaching attack on that testimony." State v. Meeks, 867 S.W.2d 361, 374 (Tenn. Crim. App. 1993) (citing State v. Braggs, 604 S.W.2d 883, 885 (Tenn. Crim. App. 1980)). However, there are two circumstances in which prior consistent statements may be admissible. The first is where a prior consistent statement is allowed "to rebut the inference that the witness's testimony was a recent fabrication." State v. Bush, 942 S.W.2d 489, 516 (Tenn. 1997). The second is when a witness's prior statement is used out of context to cross-examine the witness. State v. Boyd, 797 S.W.2d 589, 593-94 (Tenn. 1990). Furthermore, "[t]he impeaching attack on the witness's credibility need not be successful for admissibility of a prior consistent statement." State v. Albert R. Neese, No. M2005-00752-CCA-R3-CD, 2006 WL 3831387, at *6 (Tenn. Crim. App. Dec. 15, 2006), perm. app. denied (Tenn. April 23, 2007). However, a prior consistent statement will not be admissible unless "the witness' testimony . . . [has] been assailed or attacked to the extent that the witness' testimony needs rehabilitating." State v. Hodge, 989 S.W.2d 717, 725 (Tenn. Crim. App. 1998) (citing State v. Benton, 759 S.W.2d 427, 434 (Tenn. Crim. App. 1998)).

On cross-examination, defense counsel repeatedly questioned L.H. about whether she had told the police or the forensic interviewer about several of the incidents of sexual contact. Defense counsel also questioned L.H. about why she failed to tell the police and the forensic interviewer about these instances. It is clear from defense counsel's questioning of

L.H. that defense counsel was insinuating that L.H.'s testimony was a recent fabrication. In the videotaped interview, L.H., who was 12 years old, described the incident that occurred after her mother brought her home from Wal-Mart in December 2004, the incident during breakfast where the Defendant put his penis in her mouth, and the incident where the Defendant made L.H. watch a pornographic movie in her room while sitting in a pink chair. L.H. also described how the Defendant would ask her "Who's your daddy" and the incident that occurred while L.H.'s mother was out of town on business. Moreover, before the videotape was played for the jury, the trial court instructed the jury that it was not substantive evidence and was to be used only in assessing L.H.'s credibility. This was a proper instruction "to ensure against the use of the evidence for other than corroborative purposes." Neese, 2006 WL 3831387 at *6 (citing State v. Livingston, 907 S.W.2d 392, 398 (Tenn. 1995)). Additionally, to the extent that the interview was inconsistent with L.H.'s trial testimony, that evidence would only bolster the Defendant's claims and impinge on L.H.'s credibility. Accordingly, we conclude that the trial court did not err in allowing a videotape of L.H.'s forensic interview to be played for the jury.

### III. Evidence that the Defendant Committed Attempted Bribery

The Defendant contends that the trial court erred by allowing the State to cross-examine him about illegally taking money from a parolee's family while the Defendant was employed as a parole officer. The Defendant argues that the State failed to provide a reasonable factual basis for this inquiry and that the probative value of this evidence was substantially outweighed by its prejudicial effect. The State responds that a reasonable factual basis for this inquiry was provided to the trial court and that the evidence was highly probative of the Defendant's credibility. Additionally, the State notes that the trial court properly instructed the jury that this evidence could not be considered as evidence of the Defendant's guilt for the charged crimes.

Prior to trial, the State filed notice pursuant to Tennessee Rule of Evidence 609 of its intent to use evidence of the Defendant's conviction for attempted bribery of a public servant as impeachment evidence at trial. After this notice was filed, the Defendant sought and had his conviction expunged. Accordingly, the State filed a new notice pursuant to Tennessee Rule of Evidence 608(b) to use evidence of the Defendant's specific instance of conduct regarding the attempted bribery as impeachment evidence. During the jury-out hearing on the issue, the Defendant acknowledged that he had been indicted for bribery of a public servant and pled guilty to attempted bribery of a public servant. The State also placed on the record the origin of the information and stated that it had the cashed check with the Defendant's endorsement in its possession. The trial court concluded that the probative value of the testimony regarding the Defendant's credibility outweighed its prejudicial effect.

Additionally, the Defendant admitted that he had been fired for taking a check from a parolee's family and that he initially denied the allegations during direct examination.

Rule 608(b) "governs the admissibility of prior expunged convictions to impeach a witness's testimony." State v. John C. Cline, No. E2007-01995-CCA-R3-CD, 2008 WL 4915873, at *5 (Tenn. Crim. App. Nov. 17, 2008) (citing cases). Rule 608(b) provides that "specific instances of conduct of a witness for the purpose of attacking or supporting the witness's character for truthfulness" may be inquired into on cross-examination if "the alleged conduct has probative value and [] a reasonable factual basis exists for the inquiry." If the witness is the defendant, the State must provide "reasonable written notice" of its intent to use the prior bad act as impeachment evidence, and the trial court must determine "that the conduct's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues." Tenn. R. Ev. 608(b)(3). However, "after questioning a witness about prior bad acts, the defendant cannot prevent proper cross-examination." State v. Hutchison, 898 S.W.2d 161, 171 (Tenn. 1994) (citing State v. Johnson, 670 S.W.2d 634, 636 (Tenn. Crim. App. 1984)). Defense counsel questioned the Defendant on this issue and nothing in the State's cross-examination exceeded the scope of direct examination. Accordingly, we conclude that this issue has no merit.

*IV. Variation Between State's Proof and Indictment in Count Two*

The Defendant contends that the evidence was insufficient to convict him with regards to count two of the indictment because the State's proof at trial materially varied from the allegations set forth in the indictment. The Defendant argues that the indictment alleges the offense was committed in December 2004, but that the evidence at trial showed that this offense occurred in July 2004. Accordingly, the Defendant contends, he was prevented from preparing an adequate defense because of this material variation between the State's proof and the indictment. The State responds that any variance between the date of the offense as alleged in the indictment and the proof at trial was neither material nor prejudicial.

Unless the time of the offense is a "material ingredient in the offense" an indictment does not have to provide a specific time. Tenn. Code Ann. § 40-13-207. Instead, "the offense may be alleged to have been committed on any day before the finding of the indictment, or generally before the finding of the indictment." Id. If the dates provided in the indictment are not essential to proving the offense or providing a defense, then the State is "'not required to strictly show that the offense occurred within those dates.'" State v. Jeff Carter, No. M2009-02399-CCA-R3-CD, 2010 WL 5343212, at *17 (Tenn. Crim. App. Dec. 16, 2010) (quoting State v. Howse, 634 S.W.2d 652, 657 (Tenn. Crim. App. 1982)). Any "variance between an indictment . . . and the evidence presented at trial is not fatal unless it is both material and prejudicial." State v. Shropshire, 45 S.W.3d 64, 71 (Tenn. Crim. App.

2000). While the State had to prove the victim's age at the time of the offenses, time was not a material element of the offenses. See Tenn. Code Ann. §§ 39-13-504, 522. Accordingly, "any variance between the time alleged in the indictment and the time proven at trial [was] not a material variance." Carter, 2010 WL 5343212 at *17 (citing cases).

Additionally, we believe that the Defendant is mistaken about the testimony given at trial. The Defendant contends in his brief that L.H. testified that the Defendant performed cunnilingus on her while her mother was out of town and that her mother called during this incident. During her testimony, L.H. described an incident where the Defendant sexually assaulted her when her mother was out of town. Once L.H. was finished describing this incident, the prosecutor asked her if she recalled any other instances that occurred at the Netherlands Drive residence. L.H. then described an incident where the Defendant performed cunnilingus on her one afternoon while her mother was still at work. L.H. testified that during this incident, her mother called. She said that when the Defendant answered the phone, he was out of breath and tried to rush her mother off the phone. L.H.'s mother testified that while she was away on business in July 2004, she called the Defendant, who answered out of breath and tried to rush her off the phone. It was the province of the jury to resolve any conflict between the testimony of L.H. and her mother. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Based on the foregoing, we conclude that this issue is without merit.

*V. Variance Between the Bill of Particulars and the Proof at Trial*

The Defendant contends that the trial court erred in denying his motion for judgment of acquittal. The Defendant argues that the State's proof at trial materially varied from the details found in the bill of particulars for three of the counts. The Defendant contends that in count two, the bill of particulars alleged the Defendant penetrated L.H.'s vagina with his penis, while the State's election alleged the Defendant performed cunnilingus on L.H. The Defendant also contends that the State's proof for counts six and seven materially varied from the bill of particulars because the bill of particulars did not mention that the Defendant showed pornographic movies and pornography on the computer to L.H. The State responds that any variance between the bill of particulars and the proof presented at trial was neither material, nor prejudicial.

As noted above, "[a] variance between an indictment or a subsequent bill of particulars and the evidence presented at trial is not fatal unless it is both material and prejudicial." Shropshire, 45 S.W.3d at 71. When a substantial correspondence exists between the proof presented at trial and the bill of particulars, the variance is not material. Id. As long as the bill of particulars informed the defendant "of the charges levied against him so that he can adequately prepare for trial" and protected the defendant from "subsequent

-21-

prosecution for the same offense" than any variance between it and the proof at trial will not be material. State v. Ealey, 959 S.W.2d 605, 609 (Tenn. Crim. App. 1997) (quoting State v. Mayes, 854 S.W.2d 638, 640 (Tenn. 1993)). Additionally, courts have long been "sensitive to the fact that young children who are victims of child abuse may not be able to testify that the abuse occurred on a specific date, or provide extensive details in this regard." State v. Brown, 992 S.W.2d 389, 391 (Tenn. 1999).

In the bill of particulars, counts six and seven refer to multiple instances of sexual contact between L.H. and the Defendant, including the Defendant "having [L.H.] touch his penis with her hand." In the State's election, count six refers to an incident where the Defendant made L.H. masturbate him while they watched pornography in her room while count seven refers to a similar incident while the Defendant showed L.H. pornography on the computer. The core of the State's allegations in both counts is that the Defendant forced L.H. to masturbate him. The fact that the proof at trial showed that this occurred while the Defendant forced L.H. to watch pornography did not, in any way, hinder the Defendant's ability to mount a defense against these charges. See State v. Isaiah Burton, Jr., No. M2005-00690-CCA-R3-CD, 2006 WL 1896364, at *10 (Tenn. Crim. App. July 7, 2006) perm. app. denied (Tenn. Nov. 6, 2006) (citing cases). Accordingly, we concluded that the trial court did not err in denying the Defendant's motion for judgment of acquittal with respect to counts six and seven.

With respect to count two, the bill of particulars alleged that the Defendant penetrated L.H.'s vagina with his penis, but the proof at trial established that the Defendant performed cunnilingus on L.H. Both the bill of particulars and the State's election alleged an act of rape of a child, which occurred in the residence on Netherlands Drive. Rape of a child is defined as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if such victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522. The Tennessee Code Annotated defines sexual penetration as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7). The bill of particulars and the proof at trial did not vary in the alleged offense, but the proof varied in the manner of the offense. Accordingly, we conclude that the variance was neither material nor prejudicial. See Shropshire, 45 S.W.3d at 71 (finding variance between bill of particulars alleging that defendant forced victim to touch his penis with her mouth and proof at trial which showed defendant forced victim to touch his penis with her hand was neither material nor prejudicial).

*VI. Motion for New Trial*

-22-

The Defendant contends that the trial court erred by denying his motion for new trial based on newly discovered evidence. In support of his motion, the Defendant offered an affidavit from one of L.H.'s brothers. In the affidavit, the brother alleged that his mother prevented him from speaking with defense counsel, that L.H. "always had a problem with the truth," and that L.H. resented the Defendant's attempts to discipline her. The brother also alleged that the Defendant never wore a towel around the house, there was no pornography in the house, and that L.H.'s brother would have been awakened if the Defendant ever came into the room he shared with his sister. The Defendant argues that this information is material, it directly challenges L.H.'s credibility, and this testimony would have likely changed the outcome of the trial. The State responds that the Defendant failed to show he acted with reasonable diligence to discover this evidence. The State further responds that the Defendant has failed to show how this evidence would change the results of the trial because much of the information contained in the affidavit was testified to by other defense witnesses and because L.H.'s credibility was heavily disputed by the defense at trial.

A trial court's decision refusing to grant a motion for new trial on the basis of newly discovered evidence will only be overturned by this court upon a showing of an abuse of discretion. State v. Caldwell, 977 S.W.2d 110, 117 (Tenn. Crim. App. 1997) (citing Hawkins v. State, 417 S.W.2d 774, 778 (Tenn. 1967)). As stated in State v. Nichols:

> To obtain a new trial on the basis of newly discovered evidence, the defendant must establish (1) reasonable diligence in seeking the newly discovered evidence; (2) materiality of the evidence; and (3) that the evidence will likely change the result of the trial.

877 S.W.2d 722, 737 (Tenn. 1994) (citing State v. Goswick, 656 S.W.2d 355, 358-60 (Tenn. 1983)).

As the trial court noted, the Defendant could have called L.H.'s brother as a witness at trial. There was no evidence that the Defendant attempted to contact him. Additionally, all of the information contained in the affidavit had been discussed at trial by other defense witnesses. For example, both the Defendant and Mr. Smith testified that L.H. resented the Defendant for disciplining her. Several witnesses also testified that they never saw the Defendant touch L.H. inappropriately. Defense counsel repeatedly attacked L.H.'s credibility during the trial, and the Defendant failed to present any evidence that the addition of L.H.'s brother's testimony would have altered the outcome of the trial. According, we conclude that the trial court did not abuse its discretion in denying the Defendant's motion for new trial.

*VII. Consecutive Sentences*

-23-

The Defendant contends that the trial court erred in imposing partial consecutive sentences in this case. The Defendant contends that the State failed to prove L.H. has suffered from "residual, physical or mental damage" as a result of the Defendant's actions as required by Tennessee Code Annotated section 40-35-115(b)(5). The Defendant also contends that section 40-35-115(b)(5) requires proof of "penile vaginal penetration." The Defendant further contends that his sentence was "greater than that deserved for the offenses committed." The State responds that all of the requirements of section 40-35-115(b)(5) were proven at trial and at the sentencing hearing. The State further responds that given the severity of the offenses committed against L.H., consecutive sentencing was warranted.

An appellate court's review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). As the Sentencing Commission Comments to this section note, on appeal the burden is on the Defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, the court may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991); see also State v. Carter, 254 S.W.3d 335 (Tenn. 2008).

The trial court relied on Tennessee Code Annotated section 40-35-115(b)(5) in imposing consecutive sentences. This section requires that the defendant be convicted of two or more statutory offenses involving "sexual abuse of a minor" and that the trial court consider "the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims[.]" Tenn. Code Ann. § 40-35-115(b)(5). Nowhere in this section is the term "sexual abuse" limited to "penile vaginal penetration." Additionally, this section is based upon the Tennessee Supreme Court's decision in State v. Taylor which involved multiple sex acts including, oral, anal, and vaginal intercourse. 739 S.W.2d 227, 230 (Tenn. 1987). Accordingly, we conclude that the Defendant's argument that section 40-35-115(b)(5) does not apply because there was no evidence of "penile vaginal penetration" is without merit.

Regarding section 40-35-115(b)(5)'s requirement that the trial court consider "the extent of the residual, physical and mental damage to the victim" we conclude that the trial court did not err in its decision. The State presented evidence that L.H. had fallen behind in school; had suffered from nightmares and slept with a knife under her bed; and had suffered from depression and an overall sense of guilt since reporting her abuse. This evidence, along with the lengthy period of time the abuse went undetected, the Defendant's close relationship to L.H., and the extensive nature of the sexual activity justified the imposition of consecutive

sentences. Accordingly, we conclude that the trial court did not abuse its discretion in imposing consecutive sentences.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE